IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **HAROLD E. BEAL,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) Civil No. **04-268-CJP**[1] |
| | ) |
| **JO ANNE B. BARNHART**[2], | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## ORDER

**PROUD, Magistrate Judge:**

By written opinion dated December 26, 2002, Administrative Law Judge Joseph E. Brezina concluded that plaintiff Harold E. Beal was not disabled, and that, despite several "severe" impairments, he was capable of performing a limited but significant range of "light" work. The Appeals Council of the Social Security Administration denied plaintiff's request for review, making ALJ Brezina's decision the final decision of the Agency. Pursuant to 42 U.S.C. § 405(g), plaintiff now seeks review of the administrative decision denying him a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i), Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382.  **(Doc. 1).**  The administrative record and the parties' briefs are before the Court.  **(Docs. 7, 13 and 17).**

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), upon the consent of the parties **(Docs. 4 and 8)**, U.S.District Judge James L. Foreman referred this case to the undersigned Magistrate Judge for any and all proceedings and entry of judgment **(Doc. 10)**.

[2] Plaintiff's complaint does not refer to the Commissioner of Social Security by name; this Court takes judicial notice that Jo Anne B. Barnhart became Commissioner of the Social Security Administration November 9, 2001.

## Issues Presented

Plaintiff Beal argues:

1. The ALJ ignored evidence favorable to plaintiff:

   a. Deficiencies in concentration, persistence and pace; and

   b. Dr. Jack C. Tippett's conclusion that plaintiff could stand and/or walk no more than two hours in an eight hour day;

2. The ALJ failed to meet his burden of proof, in that the hypothetical posed to the vocational expert and relied upon by the ALJ did not contain any information regarding sit/stand requirements;

3. The ALJ failed to properly credit plaintiff's complaints of pain because they are not supported by the evidence and plaintiff only takes over the counter pain medication, ignoring evidence of severe spinal stenosis and degenerative disc disease in the lumbar spine; and

4. The ALJ improperly discounted a treating psychiatrist's GAF assessment of 40-50– impressions confirmed by state disability examiners.

**(Doc. 13).**

The defendant Commissioner generally counters that sufficient evidence in the record supports the ALJ's decision, particularly in light of the fact the ALJ's final decision incorporated by reference the summary of medical evidence from an earlier decision. **(Doc. 17).**

**Applicable Legal Standards**

To qualify for DIB or SSI[3], a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. §§ 416.920(b-f) and 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by

---

[3]The statutes and regulations pertaining to DIB are found at **42 U.S.C. § 1382, et seq.**, and **20 C.F.R. pt. 404**. The statutes and regulations pertaining to SSI are found at **42 U.S.C. §§ 1382 and 1382c, et seq.**, and **20 C.F.R. pt. 416**. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, **20 C.F.R. § 416.925** detailing medical considerations relevant to an SSI claim, relies on **20 C.F.R. pt. 404 subpt. P**, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations/Section 404 out of convenience.

substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff was, in fact, disabled, but whether ALJ Brezina's findings were supported by substantial evidence; and, of course, whether any errors of law were made. *See* ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. ***Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984).** If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Secretary at step four to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).**

**Synopsis of Relevant Evidence Regarding Plaintiff's Condition**

Plaintiff Harold E. Beal applied for SSI in November 1999, and DIB and a Period of Disability in December, 1999, alleging the onset of disability as of October 1, 1998. **(Doc. 7 ("R."), pp. 90-91 and 285-287).** For purposes of qualifying for DIB, plaintiff was insured through December 2000. Plaintiff claims disability due to sleep apnea, depression, "possible chronic fatigue" and pain. **(R. 109).** Prior to October 1, 1998, plaintiff had worked as an asbestos remover for four years, and prior to that he worked as a press operator, bus driver, truck driver and janitor. **(R. 110, 122, 304-306 and 362-364).** Plaintiff has a 12th grade education, and at the time of the last hearing before ALJ Brezina plaintiff continued to hold a commercial driver's license. **(R. 347).**

An August 1997 MRI of plaintiff's cervical spine revealed severe spinal stenosis at C7-T1 on the right side, most likely related to a bony spur; mild posterior bulging at C5-C6 and C6-C7 was also observed. **(R. 262).** From a mental health standpoint, in late August and early September, 1997, plaintiff was diagnosed with major depression and obsessive compulsive disorder; his GAF score[4] was 51 at that time, but a high of 90 was noted. **(R. 180 and 189).** Plaintiff also described insomnia– sleeping only two to three hours each night, poor concentration and an aversion to being around others. **(R. 185).** Plaintiff was prescribed Luvox

---

[4]A GAF (Global Assessment of Functioning) score of 50 denotes "Serious symptoms" or "any serious impairment in social, occupational or school functioning." ***See*, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), p. 32.** DSM-IV labels the GAF range of 50-60 as "moderate" symptoms in social or school functioning. The use of the term moderate by DSM-IV denotes only the range between mild and severe: the text describes the range as involving "serious impairment in social, occupational or school functioning." *Id.* The range between 40 and 50 denotes "serious" symptoms or impairment of social, occupational or school functioning. *Id.*

and Buspar and by the end of September 1997 plaintiff was described as "doing well." **(R. 179).** By mid-November 1997 plaintiff was able to return to work and his GAF score was 60. **(R. 178).** At that time plaintiff was discharged from treatment for "not following through." **(R. 178).**

Medical records from May 1998 indicate that plaintiff complained of experiencing fatigue and chills (similar to complaints made in August 1996). **(R. 199 and 202).** Physical examination turned-up nothing and depression was suspected. **(R. 199-200).** Plaintiff passed his DOT physical in September 1998. **(R. 196).**

A May 1999 sleep study revealed that although plaintiff had a 96.8% sleep efficiency, a high number of respiratory events indicated positional obstructive sleep apnea. **(R. 193-194).** A second sleep study was conducted in July 1999, wherein plaintiff used a CPAP unit to aid his breathing; he only had one respiratory event.[5] **(R. 223).** A CPAP unit was prescribed in October 1999. **(R. 225 and 230).** After two weeks using the CPAP unit, plaintiff was described as feeling "much better," although he was still depressed. **(R. 232).** At that time– November 1999– Dr. Michael Allen, M.D., considered plaintiff's "possible chronic fatigue" linked to his sleep apnea and depression, so Celexa was prescribed to treat the depression, and Doxycycline for fatigue. **(R. 232).** In December 1999 Dr. Allen noted that plaintiff's mood had not been improved by the Celexa, and the Doxycycline had been effective either. **(R. 232).** Plaintiff had also gotten no relief from Arthrotec, prescribed for persistent multiple joint arthralgias; Vioxx was seen as an alternative. **(R. 232).**

Plaintiff filled out an Activities of Daily Living Questionnaire in December 1999, in

---

[5]Five events is considered the upper limit of normal. **(R. 223).**

which he described being able to drive "some," and otherwise spending his days watching television, laying on the couch. **(R. 132).** Plaintiff lives with his wife and two young children; his wife essentially tends to all of the household duties and his parents care for plaintiff's children during the day. **(R. 130).** Plaintiff described difficulties remembering, concentrating and finishing projects, all of which he attributed to his sleeplessness. **(R. 130-131).** Plaintiff also described what can be informally termed "social paranoia."

In February 2000, Dr. James L. Schutzenhofer, M.D., performed a consultative evaluation of plaintiff, based on a review of Dr. Allen's records and an actual examination of plaintiff. **(R. 237-240).** Plaintiff was observed to have a normal gait and be able to be able to heel walk, toe walk, squat; he had lumbar flexion to 90°, good grip strength and finger movement; his strength was five out of five; and he had a full range of motion in all joints of his upper and lower extremities, with no pain upon movement of "most" of his limbs. **(R. 239;** *see also* **241-242).** Dr. Schutzenhofer opined that plaintiff had chronic fatigue and sleep apnea, as well as chronic pain of most joints and apparent depression. **(R. 239).** At that same time, Dr. Stephen G. Vincent, Ph.D., performed a psychological evaluation based on a review of records and an examination of plaintiff. **(R. 243-245).** Dr. Vincent observed that plaintiff walked with a limp and complained of low back pain and generalized aches and pains which were "getting worse." **(R. 243).** Testing indicated plaintiff had a variable mood, prominent depression and trouble focusing due to pain-related complaints. **(R. 244).** Plaintiff was diagnosed with "Major Depression, Secondary to General Medical Condition, Moderate." **(R. 245).**

One month later, in March 2000, a Mental Residual Functional Capacity Assessment was proffered by Donald Henson, Ph.D., Mary Helen McGrew, Psy.D. and Emily Vincent, M.A.,

indicating that plaintiff had moderate limitation in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and interact with the general public, although he could perform simple tasks. **(R. 166-168).** Signs of major depression were demonstrated which would interfere with plaintiff's ability to perform complex tasks. **(R. 168).** More specifically, plaintiff was considered to have the affective disorder of recurrent major depression with sleep disturbance, decreased energy, feelings of guilt and worthlessness, and difficulty concentrating or thinking. **(R. 169-170, 172).** The degree of limitation on daily living activities was deemed "moderate" relative to difficulty maintaining social functioning, and plaintiff was found to "often" be deficient in concentration, persistence or pace. **(R. 176).**

An April 2000 Physical Residual Functional Capacity Assessment by Drs. Pardo and Wichterman, based on a record review, indicated plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently, stand and/or walk for six hours out of an eight hour work day, sit for six hours, and his ability to push and pull with all extremities was not limited. **(R. 159).** Plaintiff was considered capable of a limited range of light work. **(R. 165).**

In late June 2000, plaintiff completed pain, fatigue and activity questionnaires. **(R. 141-142, 143-144, and 145-148).** By his own account, plaintiff's fatigue and pain began in 1995. **(R. 141 and 143).** His pain was all over, including his ears, throat, back, legs, jaws and joints. **(R. 141).** Plaintiff described the pain as worsening over the years. **(R. 141).** According to plaintiff, his pain lasts all day, and he takes Tylenol, Advil and Aleve one or two times per day for relief, and he also takes hot baths and muscle rub for relief. **(R. 141-142).** Plaintiff 's pain decreases for a few hours, but it never disappears. **(R. 141).** With respect to his fatigue, after activity, plaintiff has to take several days to recuperate. **(R. 143).**

Dr. Watkins' June 2000 notes and mental status exam indicate that plaintiff was mildly depressed. **(R. 250).** His GAF score was in the 40-50 range. **(R. 251).** Although plaintiff exhibited obsessive compulsive traits, his symptoms did not cause significant problems for plaintiff or others, and he did not actually meet the criteria for an obsessive compulsive disorder. **(R. 248-249 and 251).** In July 2000, Dr. Watkins opined that plaintiff's depression and anxiety disorder "are highly related to his medical and financial problems," and "his psychiatric problems are the primary cause for his disability at present." **(R. 246).** Plaintiff was prescribed Zoloft, but Dr. Watkins' October 2000 notes reflect that it did not help plaintiff. **(R. 246-247 and 265).** Plaintiff was still experiencing mild insomnia in August, despite using a CPAP unit. **(R. 266-267).**

Dr. Allen's July 2001 notes indicate that plaintiff did not appear to be depressed, although he still was afflicted with chronic fatigue. **(R. 282).** In late October 2001 plaintiff's low back pain was described as waxing and waning, and he was prescribed Celebrex. **(R. 281).** An MRI the following month revealed degenerative disc disease at L4-L5 and L5-S1. **(R. 283).** During that same time period plaintiff's sleep apnea and chronic fatigue persisted; plaintiff was no longer using the CPAP unit because he could not afford it, and he was prescribed Phentermine, which did improve his daytime fatigue considerably. **(R. 281).**

During a hearing before ALJ Brezina in August 2001 plaintiff testified that he was unable to work because he is always totally exhausted. **(R. 307).** Plaintiff reported spending his days alternating between sitting in a chair and laying down, and sleeping. **(R. 322).** According to plaintiff, the CPAP unit never helped his sleep apnea, and he awakes unrefreshed after speaking. **(R. 310).** Plaintiff described being in pain all over, every day– mostly in his upper and lower

back and knees. **(R. 308-309).** Plaintiff stated that, on average, his pain was three or four on a ten scale, with a low of two and a high of eight, which occurred 10-12 times per month. **(R. 309).** Plaintiff's pain affected his concentration. **(R. 310).** Plaintiff also explained that medications prescribed for his depression did not help. **(R. 311).**

A year later, in July 2002, Dr. Jack Tippett, M.D., performed an orthopaedic evaluation of plaintiff. Dr. Tippett initially observed:

> This is a friendly cooperative gentleman . . . . He walks without a limp. He does not require external assistance in walking. He can stand on his toes and on his heels. He can assume a squatting position and return to the standing position without assistance. When asked to bend forward at the waist he reaches halfway between his knees and his ankles and then returns to the standing position. He can dress and undress himself except that he asked his wife to remove and replace his shoes. He can get on and off the examining table without assistance.

**(R. 271).** Upon examination, no specific abnormalities were noted in Plaintiff's bones, joints and muscles, other than some mild generalized weakness rated 4/5. **(R. 270-272 and 278).** Plaintiff's depression was also noted. **(R. 272).** With respect to plaintiff's ability to do work-related activities, Dr. Tippett opined plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for "at least" two hours out of an eight hour work day; sitting was unaffected; pushing and pulling with all extremities was limited due to generalized weakness; and a history of intermittent muscle spasms in his hands and legs limited manipulation. **(R. 273-276).**

At a second hearing before ALJ Brezina in October 2002, plaintiff testified much as he had before. At that time plaintiff described experiencing back pain– mostly in his upper back, a sharp pain averaging six or seven on a ten scale, at best a four and at worse a nine, which occurs more than 15 days per month. **(R. 352-353).** Plaintiff rated his low back pain as typically a

three on a ten scale. **(R. 355).** For his pain plaintiff takes hot baths, muscle rub, Tylenol and Advil– all with no relief. **(R. 355).** Plaintiff continued to experience trouble sleeping, depression and difficulty remembering and concentrating. **(R. 357 and 360).**

An MRI in February 2003 showed degeneration and herniation with narrowing of the spinal canal and disc herniation at L4-L5 and L5-S1. **(R. 298).**

During both the August 2001 and October 2002 hearings plaintiff was unable to really explain why earnings records reflected insignificant earnings despite his testimony about how much he worked each year and how much he was paid. **(R. 316-321, 324, 362-370).**

### Vocational Evidence

During the October 2002 evidentiary hearing Vocational expert James Bordieri characterized plaintiff's past jobs as heavy and medium exertional work. **(R. 373).** All of plaintiff's past jobs were considered the type that would be full-time work. **(R. 375).** Bordieri opined that plaintiff's earnings do not seem realistic in light of the time plaintiff indicated he had worked. **(R. 376-377).**

ALJ Brezina posed a hypothetical to the vocational expert focusing on someone with "nine" pain, as plaintiff described. **(R. 377).** Bordieri opined that it was very unlikely that such a person could maintain sustained work. **(R. 378).** He elaborated that "nine" pain is incapacitating due to the number of days off that would result. **(R. 378).**

A second hypothetical was posed reflecting a person of plaintiff's age, education and work experience, who was limited to low stress, simple, unskilled, one, two or three step instructions not requiring intense concentration, who could not work in close proximity with coworkers, who could not have direct contact with the public, and who could lift and carry ten

pounds frequently and 20 pounds occasionally.  **(R. 378-379).**   Bordieri testified that such a person could perform plaintiff's past work as a security guard, but the ALJ noted that that job was so long ago as to not be significant.  **(R. 379).**  Consequently, it was agreed that none of plaintiff's relevant past work could be performed by such a person.  **(R. 379).**  Bordieri opined that other light, unskilled jobs readily available in the local economy in ample number could be performed, such as office cleaner, quality control inspector, and unskilled security guard or watchman.  **(R. 380).**  Sedentary jobs could also be performed, such as video surveillance monitor and production inspector.  **(R. 381).**   However, when asked about the impact if such a person "often" experienced deficiencies in concentration, persistence and pace, Bordieri thought all of those jobs would be eliminated.  **(R. 382).**  Similarly, if such a person had a GAF score of 40-50, employment would be unlikely.  **(R. 382-383).**

### ALJ Brezina's Decision

ALJ Brezina concluded that plaintiff had severe fibromyalgia, chronic fatigue, sleep apnea and depression– none of which, alone or together, qualified as a presumptively disabling condition.  **(R. 23).**  Plaintiff was not found fully credible.  **(R. 23 and 366).**  Plaintiff was considered to have the residual functional capacity for a limited range of light work (the enumerated restrictions are not relevant to the issues raised by plaintiff).  **(R. 23).**  Plaintiff was found unable to perform any of his past work.  **(R. 23).**  Plaintiff was characterized as "younger," and based on his high school education (with no transferable skills), and residual functional capacity, in accordance with Medical-Vocational Rule 202.21, and the vocational evidence, he was found not disabled.  **(R. 23-24).**

In reaching the aforementioned conclusions, ALJ Brezina acknowledged the August 1997

MRI evidence of spinal stenosis, but he also observed that Dr. Schutzenhofer's February 2000 exam did not reveal evidence of significant physical limitations.  **(R. 19).**  The ALJ also cited April and August 2000 reviews by Dr. Pardo and Dr. Wichterman concluding that plaintiff had the residual functional capacity for a full range of light work.  **(R. 19-20).**  Dr. Tippett's July 2002 evaluation was viewed as supportive of the conclusion that plaintiff could perform light work, since Tippett reported only minimal effects and only mild general weakness.  **(R. 20).**

With respect to plaintiff's psychiatric condition, ALJ Brezina relied on Dr. Vincent's February 2000 psychological evaluation indicating nothing would preclude plaintiff from simple, sedentary work.  **(R. 19).**  The ALJ discounted Dr. Watkins' June 2000 psychiatric evaluation, finding it inconsistent, in that a GAF score of 40-50 does not correspond with the description of plaintiff being only "mildly" depressed.  **(R. 19).**

ALJ Brezina found plaintiff's subjective complaints and testimony regarding his impairments to be exaggerated and not supported by the medical evidence– particularly with respect to the intensity and frequency of pain.  **(R. 21).**  The ALJ highlighted that plaintiff reported "nine" pain 15 days per month, but he took only over the counter medication.  **(R. 21).**

### Analysis

#### Step 1:

Plaintiff easily satisfies the first step in the five-step analytical test; he is not currently employed, and he has not worked since October 1998.

#### Step 2:

ALJ Brezina found that plaintiff has "severe" fibromyalgia, chronic fatigue, sleep apnea and depression at the second step in the analytical process.  However, plaintiff takes issue with

13

the fact that plaintiff's spinal stenosis at C7-T1 and degenerative disc disease at L4-L5 and L5-S1 were not characterized as "severe" impairments. Citing Dr. Tippett's evaluation and the November 2001 MRI of his lower back, plaintiff also complains that the ALJ failed to consider and discuss findings about plaintiff's low back impairment and related pain. Plaintiff further highlights that prescription medications, Vioxx and Arthrotec, did not help, and that he could not afford additional medication. Plaintiff thinks his pain was improperly discounted.

An August 1997 MRI of plaintiff's cervical spine revealed severe spinal stenosis at C7-T1. **(R. 262).** However, plaintiff continued to work for a year after that MRI, and he does not claim disability until October 1998. Plaintiff also passed his DOT physical in September 1998. **(R. 196).** Dr. Schutzenhofer's February 2000 consultative exam did not mention any upper back problems. **(R. 239 and 241-242).** At that time, plaintiff complained of <u>low</u> back pain. **(R. 243).** An April 2000 residual functional capacity assessment qualified plaintiff for a limited range of light work. **(R. 165).** In August 2001 plaintiff did describe being in pain, mostly in his upper and lower back and knees; but in late October 2001, plaintiff complained of <u>low</u> back pain, not upper back pain. **(R. 281 and 308-309).** Dr. Tippett's July 2002 observations and examination did not reveal any upper back issues. **(R. 270-272).** It was not until the October 2002 hearing that plaintiff described experiencing back pain– mostly in his upper back, a sharp pain averaging six or seven on a ten scale, at best a four and at worst a nine, which occurs more than 15 days per month. **(R. 352-353).** However, as the ALJ noted, plaintiff only took over the counter medication.

There is no evidence of plaintiff's low back impairment until late October 2001, when plaintiff's low back pain was described as waxing and waning, and he was prescribed Celebrex.

14

**(R. 281).** An MRI the following month revealed degenerative disc disease at L4-L5 and L5-S1. **(R. 283).** However, again, Dr. Tippett's July 2002 observations and examination did not reveal any back issues. **(R. 270-272).** And, by plaintiff's own account in October 2002, his low back pain was typically a three on a ten scale, for which plaintiff only took over the counter medication. **(R. 355).**

There is simply insufficient objective evidence that plaintiff's upper or lower back impairments were severe or impacted his daily activities. Plaintiff reads more into Dr. Tippett's conclusions than is there, or than is supported by his observations and evaluation. All that supports the notion that plaintiff's upper and lower back ailments are severe is plaintiff's subjective testimony, which was justifiably discounted by the ALJ.

Section 404.1529(c)(2) dictates that subjective statements about the intensity and persistence of pain, and its effects on one's ability to do work, should not be rejected solely because they are not substantiated by available medical evidence. At the same time, an ALJ's credibility determinations are given "special deference because the ALJ is in the best position to see and hear the witness and determine credibility." ***Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).** "Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities." ***Luna v. Shalala*, 22 F.3d 687, 691(7th Cir. 1994).**

Plaintiff's repeated inability to explain why his recorded earnings and the amount he says he worked do not correspond by any stretch of the imagination show that plaintiff is clearly not credible. Plaintiff's assertion that he could not afford medication and therefore only took over

15

the counter medication is specious– there is no indication that plaintiff was actually prescribed medications which he could then not afford to obtain (with the exception of the CPAP unit). There is also a striking lack of corroboration in the medical records for plaintiff's subjective complaints. Therefore, no error can be found in the ALJ's failure to find plaintiff's upper and lower back impairments and purported back pain as severe.

### Step 3:

Plaintiff does not take issue with the ALJ's conclusion that none of plaintiff's severe impairments, alone or in combination, met or equaled the presumptively disabling diseases listed at 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A. Therefore, no further analysis of step three in the analytical test is warranted.

### Step 4:

ALJ Brezina determined that plaintiff could not perform any of his past relevant work. Therefore, no further analysis at step four is required. At this juncture, the burden shifts from plaintiff to the Agency. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir.1984).**

### Step 5:

At step 5 in the analytical scheme the issue is whether, given his age, education and work experience, plaintiff can perform any other work. Plaintiff claims that the ALJ ignored and/or discounted evidence of deficiencies in concentration, persistence and pace, a GAF score of 40-50, and Dr. Tippett's evaluation indicating plaintiff could not stand for more than two hours during an eight hour work day, which is essential to light work.

Step 5 hinges in great part on residual functional capacity. Residual functional capacity is an administrative assessment of what work-related activities a claimant can perform *despite*

his or her limitations.  *See* **20 C.F.R. § 404.1545(a); and** *Dixon v. Massanari*, **270 F.3d 1171, 1178 (7th Cir. 2001).** "In assessing the claimant's [residual functional capacity], the ALJ must consider both the medical and nonmedical evidence in the record." *Id.*  For reference it is important to keep in mind the definition of light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**20 C.F.R. §§ 404.1567(b) and 416.967(b).**

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  **20 C.F.R. § 416.967(a).**  According to Social Security Ruling 83-10 (1983), sedentary work requires not more than 2 hours standing or walking during an eight hour work day, and medium work requires six hours which, by implication, indicates that light work requires the ability to stand or walk for two to six hours out of an eight hour work day.  Therefore, light work requires one be able to stand for at least two hours.

As a preliminary matter, it must be noted that plaintiff's argument that the ALJ ignored Dr. Tippett's evaluation indicating that plaintiff could not stand for more than two hours is

17

fatally flawed.  Dr. Tippett's report indicates plaintiff could stand and/or walk for "at least" two hours out of an eight hour work day, and sitting was unaffected.  **(R. 273-274).**

In March 2000, a Mental Residual Functional Capacity Assessment form completed by Donald Henson, Ph.D., Mary Helen McGrew, Psy.D. and Emily Vincent, M.A., indicates plaintiff was found to "often" be deficient in concentration, persistence or pace.  **(R. 176).**  Vocational expert Bordieri opined that a person who "often" had deficiencies in concentration, persistence and pace could not perform the light and sedentary jobs he had thought were hypothetically appropriate for plaintiff.  **(R. 382).**  Plaintiff argues that the ALJ did not discuss or square these two pieces of evidence.

A review of the record reveals that plaintiff has ignored Henson and McGrew's detailed evaluation, which indicates plaintiff had only moderate limitation in his ability to carry out detailed instructions, maintain attention and concentration for extended periods.  **(R. 166-168).**  Thus, Henson and McGrew actually found that plaintiff "often" was "moderately" limited in concentration, persistence and pace.   They specifically found that plaintiff could concentrate sufficiently for simple tasks, and he retained the capacity to perform simple tasks.  **(R. 168).**  Defendant correctly observes that this limitation was incorporated into the hypothetical proffered to the vocational expert, and the Court notes that the ALJ's findings account for these limitations.  **(R. 21).**

Plaintiff also argues that the ALJ improperly discounted the GAF score of 40-50 noted by his treating psychiatrist, Dr. Watkins, in June 2000.  **(R. 251).**  A GAF (Global Assessment of Functioning) score of 50 denotes "Serious symptoms" or "any serious impairment in social, occupational or school functioning." ***See*, Diagnostic and Statistical Manual of Mental**

**Disorders, Fourth Edition (DSM-IV), p. 32.** DSM-IV labels the GAF range of 50-60 as "moderate" symptoms in social or school functioning. The use of the term moderate by DSM-IV denotes only the range between mild and severe: the text describes the range as involving "serious impairment in social, occupational or school functioning." *Id.* The range between 40 and 50 denotes "serious" symptoms or impairment of social, occupational or school functioning. *Id.*

A treating physician or psychiatrist's opinion will generally be given more weight, provided it is "well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." **40 C.F.R. § 404.1527(d)(2).** Therefore, although the opinion of plaintiff's treating psychiatrist, Dr. Watkins, must be considered, it is not necessarily controlling. **40 C.F.R. § 1527(e);** *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). ALJ Brezina found Dr. Watkins' description of plaintiff being only "mildly" depressed inconsistent with the GAF score of 4-50; accordingly, Dr. Watkins' June 2000 evaluation was not given significant weight. **(R. 19).**

A review of Dr. Watkins' June 2000 report confirms that he described plaintiff as being only mildly depressed, which certainly moves plaintiff out of the 40-50 range. **(R. 250).** This conclusion is in line with Dr. Watkins' comment one month later that plaintiff's depression and anxiety disorder were not the primary cause of his disability; rather, he thought those impairments were related to plaintiff's medical and financial problems. **(R. 246).** It is also worth observing that Dr. Allen's July 2001 notes indicate that plaintiff did not appear to be depressed **(R. 282)**; therefore, even if that 40-50 score were accurate, plaintiff's condition had improved. The record as a whole simply does not support a GAF score of 40-50. As detailed

above in the synopsis of the evidence, plaintiff consistently exhibited "mild" and "moderate" impairment, not "severe" impairment.

"All that is required is that the hypothetical question [to the vocational expert] be supported by the medical evidence in the record." **Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir. 1987).** Although plaintiff may disagree with the ALJ's residual functional capacity assessment, such determinations are reserved exclusively to the Commissioner (20 C.F.R. § 404.1527(e)), and there is substantial evidence to support the specific determination made by the ALJ in this case. No further discussion of the hypothetical relied upon by the ALJ is warranted because all of the issues plaintiff has raised have been addressed and rejected by the Court.

**IT IS THEREFORE ORDERED** that, for the aforestated reasons, the Agency decision denying plaintiff Harold E. Beal a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i), Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382, is affirmed in all respects. Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED: September 19, 2005**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**